IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs May 1, 2017

**IN RE RYLAN G., ET AL.**

**Appeal from the Juvenile Court for Claiborne County**
**No. 2015-JV-1659   Robert M. Estep, Judge**

_____

**No. E2016-02523-COA-R3-PT**

_____

This is a termination of parental rights case.   The trial court terminated Appellant/Mother's parental rights on the grounds of: (1) abandonment by failure to provide a suitable home; (2) substantial non-compliance with the permanency plan; and (3) severe child abuse. Because  Appellee, Tennessee Department of Children's Services, did not meet its burden to show that it exercised reasonable efforts to assist Mother in obtaining suitable housing, we reverse the trial court's finding as to the ground of abandonment by failure to establish a suitable home.  The other grounds for termination of Mother's parental rights are met by clear and convincing evidence, and there is also clear and convincing evidence that termination of Mother's parental rights is in the best interests of the children.  Affirmed in part, reversed in part, and remanded.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed in Part; Reversed in Part; and Remanded**

KENNY ARMSTRONG, J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., and W. NEAL MCBRAYER, JJ., joined.

Jordan Chandler Long, Knoxville, Tennessee, for the appellant, Ariel G.

Herbert H. Slatery III, Attorney General and Reporter, and W. Derek Green, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

# OPINION

## I. Background

This case involves three minor children, Rylan G.[1] (born March 2011), Myka G. (born August 2012), and Adisyn G. (born September 2013) (collectively, the "Children"). The Children's mother is Ariel G. ("Mother," or "Appellant"), and their father is Edward G. ("Father"). In February of 2014, the Tennessee Department of Children's Services ("DCS," or "Appellee") became involved with the family. On or about February 24, 2014, Adisyn was taken to the emergency room of East Tennessee Children's Hospital. She exhibited seizure-like behavior and had bruises on her scalp, forehead, and eyes. Mother and Father reported that Adisyn had accidentally hit her head on a toy; however, medical personnel examined the injuries and determined that the injuries could not have occurred in the manner reported by the parents. Dr. Marymer Perales, a forensic pediatrician, opined that the injuries were caused by trauma.

On February 27, 2014, DCS filed a petition for a restraining order against Mother and Father in the Juvenile Court of Claiborne County ("trial court"). On February 28, 2014, the trial court entered a restraining order against Father, ordering no contact between Father and the Children and removing Father from the home. The trial court's order also required that Mother allow no contact between Father and the Children. The trial court also appointed a *guardian ad litem* for the Children. In August or September of 2014, the Children, Mother, and Billy D. (Mother's paramour) moved into the home of the maternal grandmother. On March 23, 2015, a DCS case manager contacted Mother because Billy disclosed to police that he spanked Myka and bruised her. DCS cautioned Mother to monitor Billy's discipline of the Children.

On November 18, 2015, Mother left the Children with Billy while she was at work. When Mother returned home, she found Myka's face bruised and swollen. Mother testified that Billy told her that Myka hit her head while at a doctor's appointment earlier in the day. Mother took a photograph of Myka's injuries. The next morning, on November 19, 2015, Mother noticed that the bruising had worsened, and she took Myka to the emergency room at Claiborne County Hospital. Myka had significant bruising on her scalp, forehead, eyes, and left underarm; her face was puffy, and her left eye was swollen shut. The same morning, Myka was transferred to East Tennessee Children's Hospital for further treatment. She was diagnosed with a subgaleal hematoma and required several months of recovery to reduce the swelling on her face and scalp. Billy admitted to law enforcement that he punched Myka, and he pled guilty to aggravated child abuse and neglect.

---

[1] In termination of parental rights cases, it is the policy of this Court to remove the names of minor children and other parties in order to protect their identities.

On November 20, 2015, DCS filed a dependency and neglect petition on the ground of severe child abuse; DCS also requested an emergency protective custody order. On November 23, 2015, the trial court entered a protective custody order, finding the Children dependent and neglected due to an immediate threat to the Children's health or safety. The Children were placed in foster care.

On December 9, 2015, Mother, Father, and DCS entered into a permanency plan, which required Mother and Father to complete: (1) alcohol and drug assessments; (2) mental health assessments; (3) clinical parenting assessments; and (4) domestic violence classes. The plan also required Mother and Father to address environmental concerns to create a suitable home.

On April 14, 2016, DCS filed a petition to terminate Mother and Father's parental nights.[2] DCS averred the following grounds in its petition as to Mother: (1) abandonment by failure to provide a suitable home; (2) substantial non-compliance with the permanency plan; and (3) severe child abuse. The trial court heard the petition to terminate Mother's parental rights on October 13 and 14, 2016. By order of November 30, 2016, the trial court terminated Mother's parental rights on the grounds of: (1) abandonment by failure to provide a suitable home; (2) substantial noncompliance with the permanency plan; and (3) severe child abuse. Mother appeals.

## II. Issues

Mother raises four issues for review, which we restate as follows:

1. Whether DCS made reasonable efforts to assist Mother in establishing a suitable home?

2. Whether the trial court erred in terminating Mother's parental rights due to substantial noncompliance with the permanency plan?

3. Whether the trial court erred in terminating Mother's parental rights due to severe child abuse?

4. Whether the trial court erred in finding that the termination of Mother's parental rights is in the best interests of the Children?

## III. Standard of Review

Under both the United States and Tennessee Constitutions, a parent has a

---

[2] Father's parental rights were terminated by order of November 30, 2016. He is not a party to this appeal.

fundamental right to the care, custody, and control of his or her child. ***Stanley v. Illinois***, 405 U.S. 645, 651 (1972); ***Nash-Putnam v. McCloud***, 921 S.W.2d 170, 174 (Tenn. 1996). Thus, the state may interfere with parental rights only when a compelling interest exists. ***Nash-Putnam***, 921 S.W.2d at 174-75 (citing ***Santosky v. Kramer***, 455 U.S. 745 (1982)). Our termination statutes identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." ***In re W.B.***, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g)). A person seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); ***In re D.L.B.***, 118 S.W.3d 360, 367 (Tenn. 2003); ***In re Valentine***, 79 S.W.3d 539, 546 (Tenn. 2002).

Because of the fundamental nature of the parent's rights and the grave consequences of the termination of those rights, courts must require a higher standard of proof in deciding termination cases. ***Santosky***, 455 U.S. at 769. Accordingly, both the grounds for termination and that termination of parental rights is in the child's best interest must be established by clear and convincing evidence. Tenn. Code Ann. § 36-3-113(c)(1); ***In re Valentine***, 79 S.W.3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable... and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." ***In re M.J.B.***, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004). Such evidence "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." ***Id.*** at 653.

On appeal, we review the trial court's findings of fact "*de novo* on the record, with a presumption of correctness of the findings, unless the preponderance of the evidence is otherwise." ***In re Taylor B.W.***, 397 S.W.3d 105, 112 (Tenn. 2013); Tenn. R. App. P. 13(d). We then make our "own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim." ***In re Bernard T.***, 319 S.W.3d 586, 596-97 (Tenn. 2010). We review the trial court's conclusions of law *de novo* with no presumption of correctness. ***In re J.C.D.***, 254 S.W.3d 432, 439 (Tenn. Ct. App. 2007).

## IV. Grounds for Termination

As noted above, the trial court relied on the following statutory grounds in terminating Appellant's parental rights: (1) abandonment by failure to provide a suitable home; (2) substantial noncompliance with a permanency plan; and (3) severe child abuse. Although only one ground must be proven by clear and convincing evidence in order to terminate a parent's rights, the Tennessee Supreme Court has instructed this Court to

review every ground relied upon by the trial court to terminate parental rights in order to prevent "unnecessary remands of cases." ***In re Angela E.***, 303 S.W.3d 240, 251 n.14 (Tenn. 2010). Accordingly, we will review all of the foregoing grounds.

### A. Abandonment by Failure to Establish a Suitable Home

The trial court found, by clear and convincing evidence, that Mother's parental rights should be terminated on the ground of abandonment by failure to provide a suitable home, pursuant to Tennessee Code Annotated Section 36-1-113(g)(1), as defined at Tennessee Code Annotated Sections 36-1-102(1)(A)(i). In pertinent part, Tennessee Code Annotated Section 36-1-113(g) provides:

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:
>
> > (1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred[.]

Tenn. Code Ann. § 36-1-113(g)(1). Tennessee Code Annotated Section 36-1-102 defines "abandonment," in relevant part, as follows:

> (1)(A) For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:
>
> > * * *
>
> > (ii) The child has been removed from the home of the parent or parents or the guardian or guardians as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has

- 5 -

made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department[.]

In its order terminating Mother's parental rights, the trial court found:

In the summer of 2016, [M]other resided with a new paramour and that home had additional concerns including broken windows and exposed wiring. The efforts made by [DCS] under those circumstances were reasonable. Ultimately the issue of the safety of the home revolves around [Mother's] choices of men. Her choices have not only been bad, they have been dangerously bad. Her inability to choose wisely and protect her children has led to this difficult conclusion that she has abandoned her children based on the failure to provide a suitable home. [DCS] made reasonable efforts to assist [Mother] to the best extent that it could. By clear and convincing evidence, the requirements of Tenn. Code § 36-1-113(g)(1) and 36-1-102(1)(A)(ii) have been met for abandonment for failure to provide a suitable home.

Mother argues that DCS failed to make reasonable efforts to assist her in establishing a suitable home for the Children. As noted by the trial court, Tennessee Code Annotated Section 36-1-102(1)(A)(ii) requires DCS to make "reasonable efforts" related to housing during the relevant time period.[3] Because the Children were removed on November 19, 2015, the relevant four-month time period referenced in the statute is November 20, 2015 to March 20, 2016. From our review of the record, Mother has

---

[3] Although the Tennessee Supreme Court has overruled caselaw requiring "DCS to prove by clear and convincing evidence that it made reasonable efforts to reunify as a precondition to termination of parental rights," *In re Kaliyah S.*, 455 S.W.3d 533, 555 n.34 (Tenn. 2015), pursuant to the requirements in Tennessee Code Annotated Section 36-1-102(1)(A)(ii), when termination is sought on the ground of abandonment for failure to establish a suitable home, DCS must make reasonable efforts "to assist the parent… to establish a suitable home for the child…." *See In re Yariel S., et al.*, No. E2016-00937-COA-R3-PT, 2017 WL 65469 (Tenn. Ct. App. Jan. 6, 2017), at *6 (concluding that the record lacked any evidence as to DCS' efforts related to housing and reversing the abandonment ground for termination).

maintained a transient lifestyle since the Children were removed from her custody. After Billy's incarceration for child abuse, Mother established a relationship with a new paramour, Mario M., and moved into Mario's house. Mother ended this relationship in July of 2016 and moved into a friend's apartment, for approximately one month, where she slept on a couch. At the time of trial, Mother stated that she had moved to a second friend's apartment and had stayed with this friend for a few weeks. Mother stated that she does not have a bedroom, and she sleeps on a couch. Accordingly, there is clear and convincing evidence that Mother has not established a suitable home for the Children. Our inquiry, however, does not end here. Because the statute requires DCS to make reasonable efforts to assist the parent in establishing a suitable home, we now turn to address that question.

Turning to the record, on June 1, 2016, DCS filed an affidavit of reasonable efforts. Although the document is titled "affidavit of reasonable efforts," the substance of the affidavit is insufficient; it contains no information about DCS' efforts to assist Mother in obtaining suitable housing. Instead, the affidavit merely restates the requirements of Mother's permanency plan, as follows:

> The parent's permanency plan requires the following steps so that the family can be reunified: The Permanency Plan requires the parents to complete an alcohol and drug assessment, mental health assessment, clinical parenting assessment, attend classes on domestic violence, child abuse and battering, and address environmental concerns.

> * * *

> The Department of Children's Services recommends that Rylan, Myka and Adisyn G[.] remain in the custody of the state of Tennessee Department of Children Services at this time, as neither parent is able to appropriately care for the children's needs and no relative or kinship placement has been identified.

> The department asks that the permanency plan be ratified on this day. The foregoing are the reasonable efforts this case manager has made to affect permanency for the child(ren) and reunite the family since the last court date.

The record indicates that, on July 13, 2016, Rachel Day, a DCS case manager, visited Mother at Mario's residence. As Ms. Day and Mother walked through the residence, Ms. Day pointed out exposed wiring, exposed insulation, and broken windows, which Mother reported she would fix. From the record, Ms. Day only provided recommendations about the condition of the property, *i.e.*, that Mother should repair the wiring, insulation, and windows. The record is devoid of any evidence that Ms. Day

provided Mother with services to establish a suitable home, *e.g.*, a referral to assist Mother in obtaining other suitable housing or in remedying the dangerous conditions in her current residence. Ms. Day also reported safety concerns about Mario, who had a dismissed statutory rape charge and prior involvement with DCS for assaulting his step-son.

The most substantial evidence related to services offered to Mother by DCS is from Mother's testimony, in which she states that she had attempted to obtain housing using CEASE, a social services provider. However, the record does not clearly indicate whether these services were offered through DCS, or whether Mother accessed the services independently. DCS proffered a report of a meeting that occurred on July 5, 2016, and the report stated that DCS provided Mother with contact information for CEASE. Nevertheless, this notation references CEASE's domestic violence counseling program, *not* its housing program. Finally, DCS was not aware, until the date of trial, that Mother had moved out of Mario's residence on July 23, 2016. When Mother was asked if she had informed DCS of her new address, Mother responded:

> A. I have not had much contact with DCS. They have not tried to contact me, and with work, I've been very busy. But, they should have—I mean, every time they've tried to get a hold of me, if they've asked me, I've told them where I'm staying.
>
> Q. Didn't you have a court date here in the Juvenile Court in the last couple of weeks?
>
> A. Yes.
>
> Q. Did you tell the DCS case manager what your new address was?
>
> A. I'm not sure, but my attorney knew.
>
> Q. You did not tell DCS what your new address was?
>
> * * *
>
> A. I did alert them that I had moved out.

Regarding Mother's effort to find her own residence, Mother testified, in relevant part, as follows:

> Q. Let's talk about when you were at CEASE. What, if any assistance were they giving you to find housing?

A. They had a Safe at Home program, which to be included in the program; you had to be a victim of domestic violence, which is probably why Gloria Lee said what she said. But, I was approved for a one-bedroom home. But obtaining a one-bedroom home or apartment in this area has proved difficult.

Q. How hard did you look?

A. Pretty hard. I think I called every apartment complex in this area….

The trial court's order notes that "[DCS] made reasonable efforts to assist [Mother to the best extent that it could," but the order does not explain the substance or timing of DCS' efforts. As held by this Court, DCS' "efforts need not be 'Herculean,'" but "[r]easonable efforts [must] entail more than simply providing parents with a list of service providers and sending them on their way. The Department's employees must use their superior insight and training to assist parents with the problems [DCS] has identified in the permanency plan, whether the parents ask for assistance or not." **State, Dept. of Children's Servs. v. Estes**, 284 S.W.3d 790, 801 (Tenn. Ct. App. Dec. 30, 2008); *see also* **In re Jamel H.**, No. E2014-02539-COA-R3-PT, 2015 WL 4197220, at *6-7 (Tenn. Ct. App. July 13, 2015) (reversing the ground of abandonment by failure to provide a suitable home where "the record is devoid of any evidence that DCS made any efforts related to housing during the relevant time period"); **In re Josephine E.M.C.**, No. E2013-02040-COA-R3-PT, 2014 WL 1515485, at *19-20 (Tenn. Ct. App. Apr. 17, 2014) (stating that there was not clear and convincing evidence that DCS made reasonable efforts to assist mother in establishing a suitable home where DCS offered to evaluate mother's future housing for safety but appeared to provide no other services); **In re Isabel V.O.**, No. M2012-00150-COA-R3-PT, 2012 WL 5471423, at *8-9 (finding insufficient efforts to assist parents in obtaining suitable housing where DCS provided lists of housing services and resources to parents) (Tenn. Ct. App. Nov. 8, 2012); **In re C.H.E.H.**, No. E2007-01863-COA-R3-PT, 2008 WL 465275, at *11 (Tenn. Ct. App. Feb. 21, 2008) (finding that DCS put forth no evidence of its efforts to help mother obtain housing at any time and reversing the ground of abandonment by failure to provide a suitable home, where mother was released from incarceration and obtained family housing services by her own efforts); **In re K.E.R.**, No. M2006-00255-COA-R3-PT, 2006 WL 2252746, at *7 (Tenn. Ct. App. Aug. 3, 2006) (reversing the ground of abandonment by failure to provide a suitable home, where mother's child was removed while she was incarcerated, and it was "unclear whether the Department made any efforts to help [m]other procure housing during this particular period" of incarceration). In this case, DCS failed to meet its burden to show that it made reasonable efforts to assist Mother in obtaining suitable housing for the Children. Accordingly, the record does not contain clear and convincing evidence to establish the ground of abandonment by failure to provide a suitable home, and we reverse this ground. We now turn to address the remaining grounds.

## B. Substantial Non-compliance with the Permanency Plan

Tennessee Code Annotated Section 36-1-113(g)(2) provides that a parent's rights may be terminated when "[t]here has been substantial noncompliance by the parent ... with the statement of responsibilities in a permanency plan." However, as discussed by this Court in ***In re M.J.B.***, 140 S.W.3d 643 (Tenn. Ct. App. 2004):

> Terminating parental rights based on Tenn. Code Ann. § 36-1-113(g)(2) requires more proof than that a parent has not complied with every jot and tittle of the permanency plan. To succeed under Tenn. Code Ann. § 36-1-113(g)(2), the Department must demonstrate first that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place, ***In re Valentine***, 79 S.W.3d at 547; ***In re L.J.C.***, 124 S.W.3d 609, 621 (Tenn. Ct. App. 2003), and second that the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met. ***In re Valentine***, 79 S.W.3d at 548-49; ***In re Z.J.S.***, [No. M2002-02235-COA-R3-JV,] 2003 WL 21266854, at *12 [Tenn. Ct. App. June 3, 2003]. Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance. ***In re Valentine***, 79 S.W.3d at 548.

***Id.*** at 656-57. "Nonetheless, the permanency plans are not simply a series of hoops for the biological parent to jump through in order to have custody of the children returned." ***In re C.S., Jr., et al.***, No. M2005-02499-COA-R3-PT, 2006 WL 2644371, at *10 (Tenn. Ct. App. Sept. 14, 2006). Rather,

> the requirements of the permanency plan are intended to address the problems that led to removal; they are meant to place the parent in a position to provide the children with a safe, stable home and consistent appropriate care. This requires the parent to put in real effort to complete the requirements of the plan in a meaningful way in order to place herself in a position to take responsibility for the children.

***Id.***

On December 9, 2015, Mother agreed to the permanency plan; on January 27, 2016, the trial court ratified the plan, finding that the goals of the plan were reasonably related to remedying the conditions that necessitated foster care and were in the Children's best interests. The plan required Mother to: (1) pay child support; (2) establish a permanent and safe home; (3) complete an alcohol and drug assessment; (4)

complete a mental health assessment; (5) attend domestic violence classes; and (6) complete a clinical parenting assessment and parenting/bonding classes. As found by the trial court,

> [Mother] has basically complied with most of the action steps, with the exception that she was required to have a permanent and safe home for the children. The Court record is clear, however, that she has continued to make dangerous choices of men to be around her children and has thus failed to provide a permanent and safe home. [Therefore,] [s]he has not substantially complied….

The record indicates that Mother complied with the permanency plan's requirements to participate in alcohol and drug assessment, mental health assessment, and domestic violence classes. However, Mother's testimony reveals that she does not currently have a permanent or safe home for the Children:

> A. It is an apartment…. It is two bedrooms. Right now, I do sleep on the couch. I don't have the best paying job, but I am working to get a better job, so that I can have my own place.
>
> * * *
>
> Q. Have any of the places that you have lived since November been big enough for your girls too, or are you waiting to see what happens?
>
> A. Mario's was big enough for the children too. There was a room for them set up, but for reasons it wasn't deemed suitable.

Although the record reveals that Mother decided to leave Mario's residence on the recommendation of the Foster Care Review Board, the evidence suggests that Mother does not grasp the safety issues caused by her association with Mario. Rachel Day, DCS case manager, testified that Mother stated to her, "yes, that [Mother] was aware that [Mario] had punched his step-son in the face. And she said that—she said: I've punched him too. You just have to know him. And just kind of laughed it off." Mother agreed that she had punched her paramour's step-son because the step-son was "difficult," but she "didn't hit him hard."[4] Additionally, Mother has not completed the required parenting assessments and classes. On August 31, 2016, shortly before the hearing on the petition to terminate her parental rights, Mother filed a motion to rescind the no-contact order with the Children; this is the first step required for Mother to begin the parenting

---

[4] The record does not indicate whether this incident occurred when the step-son was a minor. Mother testified that the step-son was a "child" but stated that, by the date of trial, the step-son had turned eighteen years old.

assessment and classes; however, a considerable amount of time would be required to complete this requirement.

Mother argues that the trial court erred because she substantially completed the requirements of the plan, and she "was close to… completing the permanency plan." Indeed, the parties agree that Mother has met several requirements listed in the plan, *i.e.*, completing the alcohol and drug assessment, the mental health assessment, and domestic violence classes. However, as discussed by the Tennessee Supreme Court,

> [s]ubstantial noncompliance is not defined in the termination statute. The statute is clear, however, that noncompliance is not enough to justify termination of parental rights; the noncompliance must be substantial. Black's Law Dictionary defines "substantial" as "[o]f real worth and importance." Black's Law Dictionary 1428 (6th ed. 1990). In the context of the requirements of a permanency plan, the real worth and importance of noncompliance should be measured by both the degree of noncompliance and the weight assigned to that requirement.

*In re Valentine*, 79 S.W.3d at 548. The goal of a permanency plan is "to provide the children with a safe, stable home and consistent appropriate care…." *In re C.S., Jr., et al.*, 2006 WL 2644371, at *10. In the instant case, the Children were removed due to abuse in the household. The crucial portions of the permanency plan directly seek to resolve the lack of safety in the household, specifically by requiring Mother to: (1) acquire safe housing, and (2) complete a parenting assessment and classes. These are also the requirements of the permanency plan that Mother has failed to complete. Because Mother has failed to complete the most critical requirements of the permanency plan, we conclude that there is clear and convincing evidence to support termination of Mother's parental rights on this ground.

### C. Severe Child Abuse

In Tennessee, a court may terminate parental rights when

> [t]he parent or guardian has been found to have committed severe child abuse as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against the child who is the subject of the petition or against any sibling or half-sibling of such child, or any other child residing temporarily or permanently in the home of such parent or guardian.

Tenn. Code Ann. § 36-1-113(g)(4). "Severe child abuse" is defined, in relevant part, as:

- 12 -

(A)(i) The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death.

(ii) "Serious bodily injury" shall have the same meaning given in § 39-15-402(d).

Tenn. Code Ann. § 37-1-102(b)(21)(A)(i). Tennessee Code Annotated Section 39-15-402(d) provides, in relevant part, that "serious bodily injury ... to the child includes, but is not limited to... injuries to the skin that involve severe bruising...." This Court has discussed the "knowing" criterion set out in Tennessee Code Annotated Section 37-1-102(b)(21)(A)(i) as follows:

The words "knowing" and "knowingly" do not have fixed or uniform meanings. Their meanings in particular cases vary depending on the context in which they are used or the character of the conduct at issue. ***Still v. Comm'r of the Dep't of Employment & Training***, 657 N.E.2d 1288, 1293 n.7 (Mass. App. Ct.1995), aff'd, 672 N.E.2d 105 (Mass. 1996); ***State v. Contreras***, 253 A.2d 612, 620 (R.I. 1969). Because the parties have not supplied us with definitions of these terms, statutory or otherwise, we will employ the basic rules of statutory construction to ascertain their meaning. Accordingly, we will give these words their natural and ordinary meaning, ***Frazier v. East Tenn. Baptist Hosp., Inc.***, 55 S.W.3d 925, 928 (Tenn. 2001), and we will construe them in the context of the entire statute and the statute's general purpose. ***State v. Flemming***, 19 S.W.3d 195, 197 (Tenn. 2000). We will also construe the words in a manner consistent with the rules of grammar and common usage.

The word "knowing," when used as an adjective, connotes a state of awareness. ***In re D.P.***, 96 S.W.3d 333, 336 (Tex. Ct. App. 2001). Thus, it requires some inquiry into the actor's state of mind. A person's conduct is "knowing," and a person acts or fails to act "knowingly," when he or she has actual knowledge of the relevant facts and circumstances or when he or she is either in deliberate ignorance of or in reckless disregard of the information that has been presented to him or her. Persons act "knowingly" when they have specific reason to know the relevant facts and circumstances but deliberately ignore them.

For the purpose of determining whether a parent's conduct runs afoul of Tenn. Code Ann. § 37-1-102(b)(21), parents who are present when a child is abused but who fail to intervene to protect the child have knowingly exposed the child to or have failed to protect the child from abuse.

However, the "knowing" requirement in Tenn. Code Ann. § 37-1-102(b)(21) is not limited to parents who are present when severe abuse actually occurs. A parent's failure to protect a child will also be considered "knowing" if the parent had been presented with sufficient facts from which he or she could have and should have recognized that severe child abuse had occurred or that it was highly probable that severe child abuse would occur. ***West Va. Dep't of Health & Human Res. ex rel. Wright v. Doris S.***, 475 S.E.2d at 878-879.

***In re R.C.P.***, No. M2003-01143-COA-R3-PT, 2004 WL 1567122, at *7 (Tenn. Ct. App. July 13, 2004).

In its order terminating Mother's parental rights, the trial court found, in relevant part:

> The [trial court] finds by clear and convincing evidence that [Mother] made dangerously bad choices of allowing an individual such as Billy D[.] to be around her children and to cause such severe injury to Myka G[.]

> The warning signs were there and warnings were stated to her by case workers.

> The final choices of how to raise and protect her children were made by [Mother] and those choices were very bad.

> Therefore, the Court finds by clear and convincing evidence that [Mother] knowingly failed to protect Myka G[.] from "abuse and neglect that is likely to cause serious bodily injury or death" and therefore her rights should be terminated.

Turning to the record, Mother testified that she typically left the Children with Billy as a babysitter while she was at work. Mother admitted that she was aware that Billy's own children had been removed from his custody, and he was allowed only supervised visitation with them. On February 17, 2015, DCS case manager Jessica Collins reported to Mother that Billy had spanked Myka, resulting in a handprint-shaped bruise. Ms. Collins warned Mother to exercise caution regarding Billy's discipline of the Children. Mother acknowledged that Billy had asked her for a break from babysitting the Children. However, Mother stated that she was unconcerned with Billy's role as a caregiver; the reason that Mother provided was that Billy spent little one-on-one time with the Children: "nine times out of ten, [Billy] was not alone with the [C]hildren. My mother and my step-father were there." However, Mother also reported to DCS that Billy was the Children's "regular babysitter."

On November 18, 2015, Mother returned to the household to find Myka's face "bruised and swollen," and Mother took a photograph of her injuries to "show the doctor what it looked like." Mother asked Rylan and Myka what happened, and they told her that Myka fell on a table at school. During the night, Mother kept Myka in bed with her and woke her up several times to ask her how she felt. The next morning, Mother testified that Myka's bruising had worsened considerably and now appeared "scary," and she took Myka to the emergency room at Claiborne Hospital. Myka was transferred to East Tennessee Children's Hospital for further diagnosis and treatment. Billy confessed that he had punched Myka in the head, and he was convicted of aggravated child abused and neglect. When interviewed by DCS, Rylan provided details of the incident, and she stated that "she watched Billy[] pick Myka up by her legs and throw her on the ground, as well as kick her into a table."

At the termination hearing, DCS proffered the deposition testimony of Dr. Mary Palmer, a child abuse pediatrician and emergency room pediatric physician, who examined Myka in the emergency room. Dr. Palmer stated that she diagnosed Myka with "subgaleal bruising, typically… shearing, which is when you pull on something in two directions. And so it's been well-described that when the hair is grabbed and pulled, that you can cause this kind of injury." Dr. Palmer also expressed her concern that Mother had waited until the morning after she discovered the injury to seek medical treatment:

Q. Okay. I believe that you had testified that [Mother] told you she waited – or told the hospital that she waited prior to bringing the child into the hospital to be examined. Would that have presented any danger to the child, waiting versus bringing in immediately?

A. Yes, from several standpoints, that the injury that she had observed the night before was pretty significant. She had taken pictures of it. It was impressive enough.

\* \* \*

And so when there is a head injury that's significant, you never know that's going on inside the skull.

\* \* \*

Q. [M]other actually showed you pictures, is that correct, of the injury when she first saw it?

A. That's correct.

Q. Through those pictures were you able to tell whether or not the bruising at that point was already significant?

- 15 -

A.  Yes, it was.

Q.  Should a reasonable person have been able to determine that night that the child's injuries were significant, or was it just because of your expertise?

A.  No.  They're quite evident; the injuries are impressive.

The record indicates that, in addition to waiting to seek medical treatment for Myka, Mother was aware, prior to the incident, that Billy was not a safe caregiver for the Children.  In relevant part, Mother testified that, "due to a mistake on my part, and it was in retrospect, leaving [Billy] with my children, probably wasn't a good idea."  From DCS' interviews of the Children, this incident of abuse was not unique:

Q.  During her second interview what did [Rylan] tell you that happened?

A.  There was a forensic interview that was conducted on Rylan, and Myka, and Adisyn.  And at that time, Rylan disclosed multiple incidences of physical abuse.  However nothing about that night. She talked about many times that she had been disciplined inappropriately by multiple people.

Q.  Such as who?

A.  By Billy[], by her mom, by—she says daddy, I don't know who she is referring to, because she called Billy[] "daddy," as well as [Father]. She made it sound as if it was just a natural thing, to get whoopings.

Q.  What kind of discipline was she describing?

A.  Just whippings, like spankings, and she would talk about Myka getting her hair pulled. But there was no specific disclosures about that incident that specific night.

Q.  But during the first interview, that is when she talked about this specific night in question?

A.  Yes.

Q.  Remind me of what she said?

A.  Rylan said that Billy—daddy picks Myka up by her legs, throws her around, slams her on her head, and then she said daddy kicked Myka in the

head, and she hit the table.

Q. Was it clarified that she was talking about Billy that night?

A. Yes.

Q. She said that mommy was home or wasn't home?

A. Wasn't home.

Q. The other sisters weren't able to really talk to you about it?

A. No. Adisyn is nonverbal just because of her age. Myka, she's verbal, but she's not—it's very hard to get direct sentences from her, per se.

Based on the record, we agree with the trial court's assessment that Myka's injuries were not accidental and were the result of abuse committed by Billy. At the time the abuse was perpetrated, Mother was aware of Billy's history of inappropriate discipline of the Children and Billy's requests to have a break from babysitting the Children. Despite this, Mother continued to leave the Children in Billy's care. Accordingly, the evidence does not preponderate against the trial court's findings, and these findings clearly and convincingly support the ground of severe child abuse as set out in Tennessee Code Annotated Section 36-1-113(g)(4).

## V. Best Interests of the Children

When at least one ground for termination of parental rights has been established, the petitioner must then prove, by clear and convincing evidence, that termination of the parent's rights is in the children's best interests. *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994). When a parent has been found to be unfit (upon establishment of ground(s) for termination of parental rights), the interests of parent and children diverge. *In re Audrey S.*, 182 S.W.3d 838, 877 (Tenn. Ct. App. 2005). The focus shifts to the children's best interests. *Id.* at 877. Because not all parental conduct is irredeemable, Tennessee's termination of parental rights statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the children's best interest. *Id.* However, when the interests of the parent and the children conflict, courts are to resolve the conflict in favor of the rights and best interest of the children. Tenn. Code Ann. § 36-1-101(d). Further, "[t]he child[ren]'s best interest[s] must be viewed from the child[ren]'s, rather than the parent's, perspective." *Moody*, 171 S.W.3d at 194.

The Tennessee Legislature has codified certain factors that courts should consider in ascertaining the best interests of the children in a termination of parental rights case. These factors include, but are not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

* * *

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition….

* * *

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe....

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child....

Tenn. Code Ann. § 36-1-113(i).  This Court has noted that "this list [of factors] is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's rights is in the best interest of a child."  *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). Depending on the circumstances of an individual case, the consideration of a single factor or other facts outside the enumerated, statutory factors may dictate the outcome of the best interest analysis.  *In re Audrey S.*, 182 S.W.3d at 877.  As explained by this Court:

Ascertaining a child's best interests does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent.  The relevancy and weight to be given each factor depends on the unique facts of each case.  Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis.

*White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

In its order terminating Mother's parental rights, the trial court primarily relied on

the factors enumerated above in reaching its determination that the termination of Mother's parental rights is in the Children's best interests. Concerning factor one, *i.e.*, whether the parent has made such an adjustment of circumstances, conduct, or conditions to make it safe or in the children's best interests to be placed in the home, the trial court found that this factor weighed against Mother. The trial court stated that, "[Mother] continues to make bad choices of the individuals that she will allow to be around her children if she is reunited." The record clearly and convincingly supports this finding. Primarily, Mother's most recent paramour was involved with DCS for assaulting his step-son. Mother has since left his residence because she stated that DCS would never return the Children as long as she remained there. However, Mother does not seem to grasp DCS' concerns, as she testified that she still deems the residence of her paramour to be suitable for the Children.

The second factor, concerning the parent's lasting adjustment after DCS' reasonable efforts, weighs in favor of Mother. As stated above, this Court is unable to conclude whether DCS exercised reasonable efforts in assisting Mother to obtain suitable housing for the Children.

Turning to the fifth factor, regarding whether a change in the children's caretakers and environment would affect their emotional, psychological, and physical condition, the trial court held that "the pre-adoptive home in which the children are currently living is a good and proper home that can provide for the needs of the children." From our review of the record, the Children reside in a safe and stable foster home. Foster Mother testified that the Children are thriving in her home, do not ask for Mother, and identify their foster parents as "mommy" and "daddy." Removing the Children from their current home would likely have a negative effect on their emotional health. This is especially so in view of factor seven, concerning the safety of the parent's home. Mother's current living situation raises significant questions concerning the Children's safety and health. Specifically, Mother testified that she sleeps on a couch in a friend's apartment, and there is no space for the Children.

Turning to the eighth factor, concerning whether the parent's mental and/or emotional status would be detrimental to the children or prevent the parent from effectively providing safe and stable care and supervision for the children, the trial court found: "The evidence is clear and convincing that [Mother] continues to have the inability to make the appropriate choices of individuals that can be around her children so as to provide them with a safe and stable home." The record before this Court clearly and convincingly supports this finding. As discussed above, Mother failed to appreciate the dangers and potential for violence in her former paramour's household. At the time of trial, Mother had left Mario's residence, but still had been unable to find suitable or appropriate housing. From the totality of the circumstances, we conclude that the evidence does not preponderate against the trial court's findings, and these findings provide clear and convincing proof that termination of Mother's parental rights is in the

Children's best interests.

## VI.  Conclusion

For the foregoing reasons, we reverse the trial court's termination of Mother's parental rights on the ground of abandonment by failure to establish a suitable home.  We affirm the termination of Mother's parental rights on the remaining grounds.  We also affirm the trial court's finding that termination of Mother's parental rights is in the Children's best interests. The case is remanded for such further proceedings as may be necessary and are consistent with this opinion. Costs of the appeal are assessed against the Appellant, Ariel G.  Because Ariel G. is proceeding *in forma pauperis* in this appeal, execution for costs may issue if necessary.

_____
KENNY ARMSTRONG, JUDGE